**Dave STOCK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2007.**

Supreme Court of Alaska.

Aug. 30, 1974.

Robert B. Baker, William F. Brattain, II, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellant.

Ralph Stemp, Asst. Atty. Gen., John E. Havelock, Atty. Gen., Juneau, for appellee.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

BOOCHEVER, Justice.

Dave Stock appeals his conviction resulting from the first trial under the Alaska Environmental Conservation Act.[1]

1. AS Title 46, ch. 3. Stock was charged specifically with violation of AS 46.03.710 which provides:

No person may pollute or add to the pollution of the air, land, subsurface land or water of the state.

Although some 13 other states have similar provisions, apparently this is the first criminal appeal under any similar environmental conservation act. There has been civil litigation in this and other jurisdictions, but none of the cases involves the vagueness issue hereinafter discussed. See G & A Contractors, Inc. v. Alaska Greenhouses, Inc., 517 P.2d 1379 (Alaska 1974). Vagueness of administrative delegations was raised in Southern Illinois Asphalt v. E. P. A., 15 Ill.App.3d 66, 303 N.E.2d 606 (1973), and State v. City of Juneau, 238 Wis. 564, 300 N.W. 187 (1941), (both upholding the delegating act). Cf.

**6**

Stock contends that:

(1) The statute under which he was convicted is unconstitutionally vague;

(2) The state failed to comply with AS 46.03.130 by bringing a criminal action before completing administrative proceedings;

(3) There was a failure of proof that he was personally liable for pollution caused by the corporation of which he is president;

(4) The penalty provisions of AS 46.03.760 and AS 46.03.790 violate the equal protection and due process clauses of the United States and Alaska constitutions.

Stock was charged with having polluted the waters of the state on July 27, 1972 by contaminating Duck Creek with improperly treated sewage from the Sprucewood Trailer Court in a manner which made Duck Creek a potential health and safety hazard in violation of AS 46.03.710. He was found guilty after a jury trial and sentenced under AS 46.03.790 [2] to a 30-day suspended imprisonment and a $1,000 fine.

Upon appeal to the superior court, the conviction was affirmed, but Judge Carlson found that since there was no allegation of wilfulness, Stock should not have been sentenced under AS 46.03.790. The case was remanded for sentencing under AS 46.03.760.[3] Stock has appealed the judgment of the superior court.

The evidence at trial demonstrated that for a considerable period of time during the summer of 1972, the sewer facilities at the Sprucewood Trailer Court did not function, so that a lagoon of raw sewage developed in the area which was intended to be a septic tank leach field. Color slides of the lagoon were shown to the jury. From the lagoon, a man-made ditch drained raw sewage directly into Duck Creek. Duck Creek, a small stream which meanders through residential areas, is classified as water to be kept safe for drinking purposes. Expert testimony established that there was high but not dangerous coliform bacteria count in Duck Creek above Sprucewood; however, the coliform count was multiplied by a factor of 10 below Sprucewood, a result which, according to the opinion of environmental pollution experts, was probably caused by the sewage discharge. Eyewitness testimony established that the drainage ditch had been closed during mid-July, but on the day of the violation it had been reopened and "dug out". The lagoon, ditch and Duck Creek constituted a health and safety hazard to children playing in the water of the creek.

Metropolitan Sanitary District of Greater Chicago v. United States Steel Corp., 41 Ill.2d 440, 243 N.E.2d 249, 251 (1968). There have also been direct prosecutions for violation of local air pollution regulations which have reached appellate courts raising among their issues vagueness challenges. None has related to a definition similar to Alaska's. *See* State v. Sanner Contracting Co., 109 Ariz. 522, 514 P.2d 443, 444 (1973); People v. Detroit Edison Co., 16 Mich.App. 423, 168 N.W.2d 320 (1969); People v. International Steel Corp., 102 Cal.App.2d Supp. 935, 226 P.2d 587, 589–590 (1951), (an older case which upheld use of the Ringelmann Chart in an air pollution ordinance).

2. AS 46.03.790 provides:
 (a) A person found guilty of wilfully violating a provision of this chapter, or a regulation, written order or directive of the department or of a court made under

this chapter is guilty of a misdemeanor, and upon conviction shall be punished by a fine of not more than $1,000 and costs of prosecution, or by imprisonment for not more than one year, or by both such fine, cost, and imprisonment at the discretion of the court.
 (b) Each day upon which a wilful violation of the provisions of this chapter occurs may be considered a separate and additional violation.

3. AS 46.03.760 provides:
 (a) A person who violates §§ 710, 730, 740, or 750 of this chapter is guilty of a misdemeanor and upon conviction is punishable by a fine of not more than $25,000, or by imprisonment for not more than one year, or by both. Each unlawful act constitutes a separate offense.

 . . . . .

## I

## VAGUENESS

Stock was prosecuted for violating AS 46.03.710 which states that, "No person may pollute or add to the pollution of the air, land, subsurface land or water of the state."

The term "pollution" is defined in AS 46.03.900(15) as meaning:

. . . the contamination or altering of waters, land or subsurface land of the state in a manner which creates a nuisance or makes waters, land or subsurface land unclean, or noxious, or impure, or unfit so that they are actually or potentially harmful or detrimental or injurious to public health, safety or welfare, to domestic, commercial, industrial or recreational use, or to livestock, wild animals, bird, fish, or other aquatic life;[4]

Stock contends that the definition is so vague that men of ordinary intelligence could not know within the bounds of reasonable certainty which activities are proscribed by AS 46.03.710, and that consequently the statute violates the due process clauses of the United States and Alaska constitutions.[5]

We discussed the void for vagueness doctrine extensively in Marks v. City of Anchorage,[6] wherein a declaratory judgment was granted holding that a disorderly conduct ordinance was void. There are three considerations in determining whether a statute is unconstitutionally vague. First, if the statute is overbroad so that it may be construed in a manner to restrict the exercise of first amendment rights, it may be found to be invalid.[7] A statute may not create a threat of criminal penalties which might inhibit the exercise of those basic rights so essential to our form of government such as freedom of speech, press, religion and to assemble peaceably. But we are not here confronted with a threat to the exercise of those fundamental constitutional rights. Here the acts charged by the complaint relate to economic activities—disposal of sewage by a developer of a trailer court—and, therefore, the authorities concerned with possible "overbreadth" of allegedly vague statutes are not pertinent.[8]

4. Under authority of AS 46.03.070 which provides:

After public hearing, the department may adopt standards and make them public *and determine what qualities and properties* of water indicate a polluted condition actually or potentially deleterious, harmful, detrimental or injurious to the public health, safety or welfare, to terrestrial and aquatic life or their growth and propagation, or to the use of waters for domestic, commercial, industrial, agricultural, recreational, or other reasonable purposes.

the Department of Environmental Conservation has promulgated regulations as to Water Quality Standards, 18 AAC ch. 70. Stock, however, was not charged with a violation of those standards. We note, however, that if future offenders are charged with violation of regulations of sufficient specificity, the substantial problems involved in defining the perimeters of conduct falling within the statutory definition of the term "pollution" may be avoided.

5. Sec. 1 of the fourteenth amendment to the Constitution of the United States provides in part: "No state shall make or enforce any law which shall . . . deprive any person

of life, liberty, or property, without due process of law." Art. I, § 7 of the Alaska Constitution contains a similar prohibition.

6. 500 P.2d 644 (Alaska 1972).

7. While we are here considering overbreadth as an aspect of vagueness in that the outer contours of the statute may lack specificity, we recognize that a statute may be invalid for being overbroad although "clear and precise" if it prohibits constitutionally protected conduct. Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972); Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Zwickler v. Koota, 389 U.S. 241, 249–250, 88 S.Ct. 391, 396–397, 19 L.Ed.2d 444, 451 (1967); Marks v. City of Anchorage, 500 P.2d at 646–647.

8. In Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 842, a majority of the court indicated that where conduct and not merely speech is involved "that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plain-

The second consideration is that a statute must give adequate notice to the ordinary citizen of what is prohibited. This principle involves basic fairness and was long ago enunciated by the United States Supreme Court in Connally v. General Construction Co.,[9] stating:

> That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

A statute in its broad contours may be subject to criticism for failure to give adequate notice as to all types of conduct which are punishable, but, when not involved with the "overbreadth" problem, may still pass muster if: (a) there can be no question as to its applicability to the particular offense involved,[10] and (b) a construction may be placed upon the statute so that in the future the type of offenses coming within its purview may reasonably be understood.[11]

The third element of analysis in vagueness problems is whether the statute gives undue discretion to prosecuting authorities in determining what constitutes the crime. This can lead to arbitrary enforcement against persons who, due to their particular life styles or other factors, incur the ire of those empowered to determine who shall be prosecuted. There is, of course, a wide discretion inherent in any criminal statute as to who shall be prosecuted. Thus, one police officer may give a warning to a person travelling 60 m. p. h. in a 55 m. p. h. zone, while another may arrest a driver travelling at a like speed. Such lack of uniformity is not based on any difficulty in statutory language, but is innate in any criminal justice system involving human rather than computer controls.[12] But when inexactitude of statutory language has invited arbitrary enforcement so that there has been a history or a strong likelihood of uneven application, laws have been stricken as unconstitutional.[13]

ly legitimate sweep." Justice Douglas in dissenting agreed that the statute in question would not be subject to attack under the overbreadth doctrine if it concerned regulation of business or commercial matters. Since the mid-thirties, the United States Supreme Court has been reluctant to hold economic statutes or others not involving inhibition of first amendment rights to be void for vagueness. United States v. National Dairy Products Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561, 568 (1963), reh. den. 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13; Jordan v. De George, 341 U.S. 223, 245, 71 S.Ct. 703, 715, 95 L.Ed. 886, 889 (1951) (dissenting opinion); Winters v. New York, 333 U.S. 507, 517, 68 S.Ct. 665, 671, 92 L.Ed. 840, 851 (1948).

9. 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926).

10. Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972); United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1965).

11. Colten v. Kentucky, 407 U.S. at 111, 92 S.Ct. at 1957, 32 L.Ed.2d at 591. See Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214, 218 (1974); United States v. National Dairy Products Corp., 372 U.S. at 32, 83 S.Ct. at 597, 9 L.Ed.2d at 565.

12. The United States Supreme Court recently stated that the problems of prosecutorial discretion inherent in a broadly sweeping statute will not make the statute void for vagueness so long as the statute's proscription (implemented by construction or jury instructions if necessary) is clear. Spence v. Washington, — U.S. —, — n. 9, 94 S.Ct. 2727, 41 L.Ed.2d — (1974). We are not concerned here with a question of abuse of prosecutorial discretion. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961).

13. Papachristou v. City of Jacksonville, 405 U.S. 156, 169, 92 S.Ct. 839, 847, 31 L.Ed. 2d 110, 119 (1972); Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214, 218 (1971); Gregory v. City of Chicago, 394 U.S. 111, 120, 89

In the recent case of Smith v. Goguen,[14] the defendant had been charged with "contemptuously" treating the flag by wearing a small cloth replica on the seat of his trousers. Justice Powell speaking for the majority of the Court, stated:

> In its terms, the language at issue is sufficiently unbounded to prohibit, as the District Court noted, "any public deviation from formal flag etiquette. . . ." . . . Unchanged throughout its 70-year history, the "treats contemptuously" phrase was also devoid of a narrowing state court interpretation at the relevant time in this case. We are without authority to cure that defect. Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law. . . . In Gregory v. City of Chicago, 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969), Mr. Justice Black voiced a concern that we share against entrusting lawmaking "to the moment-to-moment judgment of the policeman on his beat." [15]

We must apply the foregoing three general considerations to the statute in question. At least as far as here applied, we are concerned with a commercial activity —the disposal of sewage from a trailer court. At the outset, therefore, we noted that this is not a case involving "overbreadth" and possible chilling of first amendment rights.

The second applicable criterion, failure to give adequate notice to the ordinary citizen as to what acts are prohibited, requires a more detailed analysis of both the nature of the act for which Stock was convicted and the statutory definition of pollution. AS 46.03.900(15) provides:

> "pollution" means the contamination or altering of waters, land or subsurface land of the state in a manner which creates a nuisance or makes waters, land or subsurface land unclean, or noxious, or impure, or unfit so that they are actually or potentially harmful or detrimental or injurious to public health, safety or welfare, to domestic, commercial, industrial, or recreational use, or to livestock, wild animals, bird, fish, or other aquatic life;
> . . .

Whatever may be the outer boundaries of conduct prohibited by AS 46.03.710 as defined by AS 46.03.900(15), it is beyond dispute that the emptying of a lagoon of raw sewage into a stream running through residential areas comes within the definition of the term "pollution". In fact, in oral argument, Stock's counsel candidly admitted that the conduct with which his client was charged came within the prohibition of the statute and that one of ordinary intelligence would know that such conduct was prohibited. His complaint in this respect refers to possible applications of the statute to other situations. Courts have often recognized that the possibility of difficult or borderline cases will not invalidate a statute where there is a hard core of cases to which the ordinary person would doubtlessly know the statute unquestionably applies.[16] Even without counsel's admission, there is simply no doubt that Stock's offense falls within the hard-core

S.Ct. 946, 951, 22 L.Ed.2d 134, 141 (1969); Marks v. City of Anchorage, 500 P.2d at 650.

14. 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

15. Id. at 575, 94 S.Ct. at 1248, 39 L.Ed.2d at 613 [citations, footnotes omitted].

16. Smith v. Goguen, 415 U.S. at 577, 94 S.Ct. at 1249, 39 L.Ed.2d at 614; Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d at 838; Winters v. New York, 333 U.S. 507, 534, 68 S.Ct. 665, 679, 92 L.Ed. 840, 859 (1948) (dissenting opinion); United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877, 1883 (1947); Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944, 947 (1945); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502, 45 S.Ct. 141, 142, 69 L.Ed. 402, 407–408 (1925); International Harvester Co. v. Ky., 234 U.S. 216, 223, 34 S.Ct. 853, 855, 58 L.Ed. 1284, 1288 (1914); People v. Detroit Edison Co., 16

prohibitions of the Environmental Conservation Act. Stock may not, therefore, complain of lack of adequate notice, and his void-for-vagueness contention will succeed only if the statute is otherwise so nebulous that it must be stricken on its face.

This case involves state waters. The same general considerations appear to apply to land and subsurface lands, but we do not reach that issue; we confine our analysis to waters. First, there must be a contamination or alteration. The term "alteration" is broader than contamination, as waters may be altered by purifying as well as befouling. While extremely broad in scope, the term "alteration" does not lack definition. Commonly understood, the word means "change", and as here used, could encompass any change in the waters whether by taking away or adding substances.

Second, the alteration must create a nuisance. The term "nuisance" has a well established meaning at common law.[17]

Or, third, it must make the waters: unclean, or noxious, or impure, or unfit so that they are actually or potentially harmful or detrimental or injurious (a) to public health, safety or welfare, (b) to domestic, commercial, industrial or recreational use, or (c) to livestock, wild animals, bird, fish or other aquatic life [subdivisions added].

The alteration must thus have a specific effect, resulting in water so impure that it is actually or potentially harmful to any one of the three categories. The definition as applied to creating conditions that are "actually", as opposed to "potentially", harmful while admittedly broad in scope, appears to have sufficient clarity in all but de minimis situations. Making waters unclean so as to be harmful to public health, safety or welfare, would not seem to present any problem of such major dimensions that one of ordinary intelligence would fail to understand the general nature of the prohibited acts. Nor does the inclusion of domestic, commercial or recreational use in the classification of the objects of harm appear to create insoluble problems of interpretation, although admittedly "recreation use" in particular may have broad contours. The most all-encompassing category of objects of prohibited harmful alteration are "livestock, wild animals, bird, fish, or other aquatic life". As Stock points out, a bucket of sewage thrown into a stream could conceivably harm some fish in the immediate area and would quite likely harm some aquatic life. Nevertheless, aside from de minimis problems, one is placed on notice that this is a *type of conduct* that is prohibited.

Stock, however, was charged with a violation of the more troublesome phrase in the statute, that which applies to alterations of water which are "potentially", as opposed to "actually" harmful. Because the sweep of the word "potentially" is so broad, we have determined that some narrowing construction is necessary.

█ We hold that by use of the word "potentially" the statute prohibits acts which a reasonable person would foresee as creating a substantial risk of making water actually injurious to the statutorily protected interests. Pertinent examples would include the disposal of atomic wastes in biodegradable containers or the construction of a septic system on a hillside known to be subject to landslides and located above a stream. Thus, in "potentiality" cases, the state must hereafter prove that the threatened injury was foreseeable to a reasonable man in the position of the defendant at the time of the act or

Mich.App. 423, 168 N.W.2d 320, 323 (1969) (air pollution); see Amsterdam, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 96–104 (1960); Collings, Unconstitutional Uncertainty—An Appraisal, 40 Corn.L.Rev. 195, 206 (1974).

17. State v. Primeau, 70 Wash.2d 109, 422 P.2d 302, 304–305 (1966). See Spur Industries v. Del E. Webb Development Co., 108 Ariz. 178, 494 P.2d 700, 705–706 (1972); Town of Clayton v. Mayfield, 82 N.M. 596, 485 P.2d 352 (1971). Stock is not charged with creating a nuisance.

omission. A foreseeability requirement assures that fair notice is given to the defendant that his conduct is within the ambit of the statute. Such an element added to the definition of the offense also criminalizes only that conduct which is serious enough to warrant enforcement and conviction, thus discouraging discriminatory enforcement.

Statutes requiring a jury to engage in a so-called "reasonable man" test have been upheld by the United States Supreme Court:

> The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct.[18]

 Our discussion of the act of pollution for which Stock was charged demonstrated that Stock could properly have been convicted of conduct causing actual harm to the environment, had the jury instruction but encompassed that part of the statute. Therefore we entertain no doubts that the jury could properly find the conduct also within the potentially harmful category. In other instances we might be persuaded to remand a case for retrial after the imposition of a narrowing construction upon the statute which the defendant was convicted of violating. We do not believe, however, that remand is called for in this case. The foreseeability requirement is no *more* than a narrowing construction. We impose it only to give the statute definite enough standards to survive on its face and in future cases. The jury in Stock's case was instructed in the part of the definitional language of AS 46.03.-900(15) as incorporated in AS 46.03.710 which Stock was accused of violating. Although Stock's counsel entered an objection to the instruction conveying the statutory language to the jury,[19] the objection raised no issue of the breadth or clarity of the "potentially harmful" language of the statute. At no time did Stock's counsel request that the statutory elements of the offense of pollution be narrowed or clarified when conveyed to the jury. The entire defense at trial was based upon a theory of Stock's non-liability for a corporate act. Closing argument by Stock's counsel is barren of any attack upon the sufficiency of the ev'dence to show a criminal offense of pollution; again the sole focus was the corporate shield defense. Counsel's concession at oral argument—that a reasonable man in Stock's position would have been aware that the conduct violated the statute—further forecloses any argument that environmental injury resulting from the sewage discharge was unforeseeable. Under these circumstances we cannot find plain error [20] in the district court's failure to anticipate and apply to Stock the narrowing construction of AS 46.03.900(15) and AS 46.03.710 which we order for future cases. We construe AS 46.03.710 under our duty to avoid the dangers of unconstitutionality.[21] In so doing we apply the familiar rule that statutes which might otherwise be unconstitutionally vague may be validated by judicial construction, and convictions obtained prior to the construc-

---

18. United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 378, 86 L.Ed. 383, 390 (1942).

19. The objection reached only the question of the propriety of reading "Dave Stock d/b/a Sprucewood Trailer Court" from the complaint to the jury.

20. Criminal Rule 30(a) provides in pertinent part:
No party may assign as error any portion of the [jury instructions] or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating

distinctly the matter to which he objects and the grounds of his objections.
In the absence of objection we have refused to recognize any errors but "[p]lain errors or defects affecting substantial rights. . . ." Crim.R. 47(b); Anthony v. State, 521 P.2d 486, 492 (Alaska 1974); Dimmick v. State, 449 P.2d 774, 776 (Alaska 1969). Stock's right to a foreseeability instruction is not "substantial", but is based, as his counsel argued to this court, upon the interests of hypothetical future defendants.

21. Hoffman v. State, 404 P.2d 644, 646 (Alaska 1965).

tion may be affirmed if the act for which the conviction was taken is within the construction and the defendant had fair notice of the statute's reach.[22] We entertain no doubt that Stock's conviction may be affirmed under the facts presented to us.

■ When the somewhat shadowy boundaries of the area of prohibited conduct are contrasted with the over-all purpose of the statute and the absence of any evidence of discriminatory application, we cannot say that the presumption of constitutionality of the statute is overcome.[23] As indicated previously, we do not have here a possible restriction on the exercise of first amendment rights, but instead a regulation of activities of a generally commercial nature. The concern indicated by the statute, the protection of the environment from pollution, has been forcefully impressed upon all in recent times. Many areas of the earth appear to have been almost irreparably harmed. Alaska, although rapidly losing its pristine character, encompasses substantial areas of some of the last unspoiled ecological systems. In enacting the statute, the legislature was faced with the constant tension between the need for economic growth and the desire to preserve that in Alaska's heritage which is rapidly becoming unique—its spectacular scenery, unspoiled forests, invigorating pure air, prolific fish and wild animals, and unsullied waterways. The goal of the legislature in seeking to place some control on activity, generally of an economic nature, as it impinges on environmental concerns is of major significance. To author a statute broad enough in scope yet sufficiently specific to accomplish that aim is obviously difficult.

There can be no doubt of the general frame of operation of the statute; no contention can be made that the statute has a subterfugal purpose or effect of curtailing the exercise of protected political or individual rights to speech, association, privacy and the like.[24] We are not here confronted with a statute, such as the vague statute condemned in *Papachristou*, where:

> definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense.[25]

■ While we may be able to conceive of instances in which the statute could be arbitrarily and capriciously enforced, we cannot on the basis of such mere hypothesis, in the absence of any history of actual arbitrary application, invalidate the statute.[26] This is particularly pertinent to

22. Colten v. Kentucky, 407 U.S. at 111, 92 S.Ct. at 1957, 32 L.Ed.2d at 591; *see* Lewis v. City of New Orleans, 415 U.S. at 131, 94 S.Ct. at 971, 39 L.Ed.2d at 218; United States v. National Dairy Products Corp., 372 U.S. at 32, 83 S.Ct. at 597, 9 L.Ed.2d at 565; Smith v. Goguen, 415 U.S. at 578 94 S.Ct. at 1250, 39 L.Ed.2d at 616 n. 27 and accompanying text.

23. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 43–44, 93 S.Ct. 1278, 1302–1303, 36 L.Ed.2d 16, 49 (1973) (state statute); United States v. National Dairy Products Corp., 372 U.S. at 32, 83 S.Ct. at 597, 9 L.Ed.2d at 565 (federal statute); United States v. R & J Enterprises, 178 F.Supp. 1, 4 (D.Alaska 1959) (Alaska statute); State v. Sanner Contracting Co., 109 Ariz. 522, 514 P.2d 443, 445 (1973) (local air pollution regulation). *Cf.* Leege v. Martin, 379 P.2d 447, 452–453 (Alaska 1963).

24. The United States Supreme Court has looked to the general purpose of the statute to understand its scope. Grayned v. City of Rockford, 408 U.S. at 110–111, 92 S.Ct. at 2299–2301, 33 L.Ed.2d at 228–229.
The preamble to the Environmental Conservation Act, AS 46.03.010, states:
It is the policy of the state [of Alaska] to conserve, improve and protect its natural resources and environment and control water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state and their over-all economic and social well being.

25. Papachristou v. City of Jacksonville, 405 U.S. at 166, 92 S.Ct. at 845, 31 L.Ed.2d at 118, *quoting* Justice Frankfurter, dissenting in Winters v. New York, 333 U.S. 507, 540, 68 S.Ct. 665, 682, 92 L.Ed. 840, 862 (1948).

26. *See supra* note 12.

the case before us, a situation admittedly within any construction of the statutory language. While we might reconsider our ruling as applied to other facts, and if presented with a different history, we hold that as here applied the statute is not void for vagueness under the Alaska and United States constitutions.

II

## PARALLEL CRIMINAL AND CIVIL PROCEEDINGS

On June 20, 1972, Commissioner of Environmental Conservation Brewer notified Stock by letter of an alleged violation of AS 46.03.710 and of regulations promulgated by the department. In accordance with AS 46.03.130,[27] Stock was given 15 days to file with the department a written report as to measures taken to control the condition. Replying on June 30, Stock indicated some attempt to correct the condition. On July 21, Commissioner Brewer again wrote Stock advising that the conditions appeared to be worsening and that the sewage ditch to Duck Creek which had been closed was reopened. At the same time a compliance order was issued pursuant to AS 46.03.-130(c) requiring him to fill in the lake with clear, coarse material and to establish adequate leaching capacity so that no standing sewage would result.

On July 25, 1972, Stock wrote that efforts to alleviate the situation were unsuccessful due to the inadequate size of a backhoe and that attempts were being made to secure a larger one. On August 8, the criminal complaint was filed.

Stock contends that the criminal complaint "was necessarily the result of a determination by the Commissioner . . . that [Stock had] refused to obey the compliance order of July 21, 1972" and that such a premature determination violated his right to request a hearing on the order within 30 days as provided by AS 46.-03.130(d).

But Stock was not charged criminally with a violation of the compliance order. AS 46.03.790 does make it a misdemeanor to wilfully violate a compliance order of the department made under the provisions of AS 46.03.130. Stock, however, was charged with a violation of AS 46.03.710 which makes pollution a crime without mention of any administrative order. Thus, the criminal proceedings against Stock were commenced under independent authority, and other than being based on the same act of alleged pollution, the charge is unrelated to the administrative action previously commenced under AS 46.03.130.

Stock contends that the doctrine of administrative primary jurisdiction required the department to pursue administrative compliance remedies before commencing criminal action. Primary juris-

27. AS 46.03.130 provides:

(a) When, in the opinion of the department, a person is violating or is about to violate regulations and standards established under the provisions of §§ 60—100 of this chapter or any other regulations concerning water pollution, the department shall notify the person of its determination by certified mail. The determination and notice do not constitute an order under § 820 of this chapter.

(b) Within 15 days from the receipt of the notice, the recipient of the determination must file with the department a report stating what measures have been and are being taken to control the conditions outlined in the notice from the department.

(c) Thereafter, the department may issue a compliance order in conformity with the authority of the department and the public policy declared in § 10 of this chapter. A copy of the compliance order shall be sent by certified mail to the person affected. A compliance order is effective upon receipt.

(d) Within 30 days of receipt, a person affected may make application for a hearing to review the compliance order. Failure to make application for hearing within 30 days of the receipt of a compliance order constitutes a waiver of the recipient's right of review.

(e) The department shall hold a hearing within 20 days of receipt of the application. After hearing, the department may rescind, modify or affirm the compliance order.

diction is a doctrine which requires that actions which raise issues calling for an exercise of administrative discretion or expertise in fact-finding be brought in the first instance before the proper administrative agency.[28] The authority cited by Stock indicates only that private parties must exhaust administrative remedies before seeking judicial review.[29] The doctrine of primary jurisdiction is only rarely applied to agencies themselves,[30] and then only when a statute specifically requires administrative enforcement actions prior to criminal prosecution.[31]

■■■ The relevant statutes here involved contemplate direct prosecution of pollution violations. AS 46.03.710 makes pollution a crime without reference to violation of any department standards, rules or compliance orders. AS 46.03.760 unequivocally provides that violation of § 710 is a misdemeanor:

> A person who violates §§ 710 . . . of this chapter is guilty of a misdemeanor and upon conviction is punishable by. . . . Each unlawful act constitutes a separate offense.

The authorization for direct criminal prosecution is particularly clear since it constitutes an amendment of former law. The former Water Pollution Control Act prohibited pollution in a statute nearly identical to AS 46.03.710,[32] but criminal prosecutions were limited to violations of departmental orders:

> A person who wilfully violates a final determination or order of the department adopted under this chapter is guilty of a misdemeanor and, upon conviction, is punishable by . . . . Each day upon which a violation occurs is a separate violation.[33]

Since no direct punishment was created for pollution, and since Alaska has no general criminal article but defines as crimes only those acts or omissions for which punishment is specifically provided,[34] the former statutes created no crime of pollution. At least sufficient doubt of the direct criminality of pollution under former statutes is created that the substantial change in statutory language made in 1968 and carried forward in 1971, whereby specific conduct unrelated to administrative action was criminalized (AS 46.03.710–760), manifests an intention that direct, criminal prosecution be permissible.

■■■ Stock was directly prosecuted for pollution without reference to a compliance order. The department was not required to exhaust the compliance-order procedure before instituting prosecution.

■■■ Stock also contends that the simultaneous prosecutions of civil and criminal remedies violated his rights to due process of law. No pertinent cases were cited by Stock, and the example he gives of such deprivation of rights is chimerical. He contends that he was faced with the choice of either remaining silent at an ad-

28. G & A Contractors, Inc. v. Alaska Greenhouses, Inc., 517 P.2d 1379, 1382–1383 (Alaska 1974) (civil action under Environmental Conservation Act) ; Oil Heat Institute, Inc. v. Alaska Public Service Corp., 515 P.2d 1229, 1233–1234 (Alaska 1973) ; Greater Anchorage Area Borough v. City of Anchorage, 504 P.2d 1027, 1032–1033 (Alaska 1972).

29. Abelleira v. District Court of Appeals, Third District, 17 Cal.2d 280, 109 P.2d 942 (1941).

30. 3 Davis, Administrative Law Treatise, § 19.02, at 13–14 (1958). See Civil Aeronautics Board v. Modern Air Transport, Inc., 179 F. 2d 622, 624 (2d Cir. 1950).

31. Id.

32. Former AS 46.05.170, § 7 ch. 117 S.L.A. 1949.

33. Former AS 46.05.210, § 10 ch. 117 SLA 1949. The language in the current act actually was added to the old act in 1968 and carried forward without change (except to make it more inclusive) in 1971. The 1968 amendment contained no provision for criminal prosecution for violation of administrative orders, and that provision was reincorporated in 1971. Thus, for three years the statutes allowed *only* direct criminal prosecution, and the criminal enforcement of administrative orders is an *addition* to the enforcement scheme in 1971.

34. AS 11.75.020.

ministrative hearing on the compliance order or waiving his right as a criminal defendant to remain silent. The record, however, fails to indicate that any administrative hearing was held. Thus, Stock was never confronted with such a choice.

The trial court committed no error in finding that Stock's rights were not violated by the commencement of the criminal action without completing administrative proceedings.[35]

## III

## INDIVIDUAL LIABILITY OF STOCK

Stock contends that the evidence was insufficient to support the jury verdict as to his individual liability. Stock was the president of Stock & Grove, Inc. which owned and operated the Sprucewood Trailer Court.

Both parties cite City of Cincinnati v. Duval[36] as setting forth the applicable standards for determination of individual criminal liability of a corporate officer. In that case, Duval was president of a corporation which owned a cafe. He took no part in the operation of the cafe, day-to-day management being entirely in the hands of a manager. Duval was accused of violating Cincinnati's anti-noise ordinance due to loud noise emanating from the cafe on a night when he was away in New York.

The court discussed the liability of a corporate officer stating:

> The fact that a person is an officer or agent of a corporation does not, of itself,

impose criminal liability upon him for the violation of a criminal statute by the corporation. . . . [B]efore a corporate officer can be guilty of the violation of a penal statute, it must appear that he was either actively engaged in the performance or direction of the act complained of, or that he knew of the violation or proposed violation of the law, and that although he had the authority to prevent its occurrence or continuance he failed to do so. . . .[37]

Because there was no evidence that Duval knew of the likelihood of a violation of the ordinance, nor evidence of a course of conduct in violation of the statute, and since Duval was away at the time of the offense, it could not be said that he actively participated in the prohibited conduct. Accordingly, the judgment of conviction was reversed.

The court in Stock's case instructed the jury in part as follows:

> If you find that the defendant acted in his capacity as President of Stock & Grove, Inc., you may not find him guilty unless you determine he commanded, directed or consented to the prohibited act [Instruction 12].

> If you find the defendant acted personally, in his own behalf or on behalf of another person or entity and knowingly ordered or performed the prohibited acts, you must find him guilty [Instruction 13].

No objection was taken to those instructions, and Stock does not contend that they

---

35. We note that simultaneous civil and criminal proceedings may jeopardize the latter in situations where objections are raised in the criminal case to the introduction of evidence produced as a result of the civil proceeding. (No such objection was made by Stock at his trial.) At least one case holds that use immunity must be granted as to testimony introduced in an administrative adjudication where parallel proceedings are prosecuted. Garrity v. New Jersey, 385 U.S. 493, 496–500, 87 S.Ct. 616, 618–620, 17 L.Ed.2d 562, 565–567 (1967). See United States v. Kordel, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d

1 (1970); Furutani v. Ewigleben, 297 F.Supp. 1163, 1165 (N.D.Cal.1969); cf. Clutchette v. Procunier, 328 F.Supp. 767, 779 (N.D.Cal.1971). See generally Article, Parallel Administrative and Criminal Proceedings in California, 5 U.C.D.L.Rev. 58 (1972).

36. 22 Ohio App.2d 208, 260 N.E.2d 127 (1970).

37. 22 Ohio App.2d at 210, 260 N.E.2d at 128 quoting 12 Ohio Jur.2d 673, Corporations, § 548.

incorrectly stated the law.[38] He argues that there was no evidence to sustain his conviction. We have stated the standard of review of a finding of guilty in a criminal case as follows:

[T]he evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.[39]

The jury was charged to convict Stock only if the state had demonstrated that "he commanded, directed or consented to the prohibited act". The state does not contend that the facts demonstrated a command or direction. Thus the test for sufficiency must be based upon "consent". Though somewhat ambiguous, "consent" necessarily implies both knowledge of the illegality and affirmative agreement to it. Thus the test is slightly more favorable to Stock than the *Duval* rule which may be satisfied by pure inaction in the face of knowledge.

The evidence was undisputed that Stock was principal stockholder and president of Stock & Grove, Inc., and thus had authority to act on its behalf. He was living in the trailer park at the time of the violation. His letter to the department explaining efforts to correct the condition indicated his knowledge of its existence and his authority to take steps to alleviate it. Although Stock did not participate in the daily affairs of the trailer court, he did have the authority to supervise the manager and his letters indicate that he took an active part in the matter in question.

There might be some question as to Stock's ability to abate the condition were it not for the fact that it became worse with the passage of time. On July 13, 1972, the ditch into Duck Creek was closed. On July 27, the date on which the violation was charged, the ditch had been "dug" open. Since Stock, well aware of the problem and admittedly taking steps towards correction of it, was living at the trailer court at the time, the reasonable inference is that he had knowledge of the reopening of the ditch permitting pollution of Duck Creek and "consented" to the condition. There was sufficient evidence and inferences therefrom to support a conclusion by a reasonable mind that there was no reasonable doubt that Stock "consented" to the violation, in the sense that he had the power and authority to abate the nuisance, but permitted it to worsen.

## IV

## THE PENALTY PROVISIONS OF AS 46.03.760 AND AS 46.03.790

Finally, Stock argues that the penalty provisions of AS 46.03.760 and AS 46.03.-790 violate the equal protection and due process clauses of the United States and Alaska constitutions.

AS 46.03.760 specifies:

(a) A person who violates §§ 710, 730, 740, or 750 of this chapter is guilty of a misdemeanor and upon conviction is punishable by a fine of not more than

---

38. Instruction 12 required for conviction a finding that Stock "commanded, directed or consented to the prohibited act". The requirement of "consent" is more favorable to Stock than the *Duval* rule as all that is needed to be proved under that rule is that Stock had knowledge of the violation and that although he had authority to prevent its occurrence or continuance, he failed to do so. Although not raised in this case, we would add the requirement that a corporate officer who did not actually engage in the direction or performance of the act complained of must have within his control the capability to correct the situation.

39. Beck v. State, 408 P.2d 996, 997 (Alaska 1965), *quoted in* Kvasnikoff v. State, 521 P.2d 903, 905 (Alaska 1974) and Hughes v. State, 513 P.2d 1115, 1117 (Alaska 1973).

$25,000, or by imprisonment for not more than one year, or by both. Each unlawful act constitutes a separate offense. . . .

AS. 46.03.790 provides for punishment for *wilful* violation of the provisions of the Environmental Conservation Act, or a regulation, written order or directive of a court made under it, by fine of not more than $1,000 and costs of prosecution, or by imprisonment for one year or both. Each day upon which a wilful violation occurs may be considered a separate and additional violation.

Stock argues that the sections constitute an unreasonable classification whereby negligent violators may be punished by a $25,000 fine while wilful violators may receive a $1,000 fine only.

First, this argument ignores the fact that each day of the wilful violation may be regarded as a separate and additional violation. Wilful pollution of 60 days duration would thus be subject to a $60,000 fine. As applied to Stock's case, it is apparent that the contamination occurred over a considerable period of time. If, then, he had been charged under AS 46.03.790, the maximum penalty could have been substantially higher than under the non-wilful provision, AS 46.03.760, which provides that each unlawful *act* constitutes a separate offense.

█ For like reasons, Stock's argument that the provisions violate the due process clause must fail. He contends that to minimize a sentence there is strong inducement to plead to a charge of being a wilful rather than negligent violator. If the sentence for wilful violation is more severe as a continuing offense, there would, of course, be no such inducement. Moreover, he assumes that he was confronted with

such an option. The "wilfulness" offense cannot be regarded as a lesser included crime within the charge of a non-wilful pollution. There could be no pressure to plead guilty to sec. 790 when it was neither charged nor available as a lesser included offense.

Stock analogizes the pressure he was under to plead guilty to the offense with a lesser penalty to the pressure the murder defendant was placed under to waive trial by jury in order to avoid the possible imposition of the death sentence in United States v. Jackson.[40] In *Jackson*, the statute provided that the death penalty could be imposed only by a jury. The defendant could avoid the death penalty by obtaining a non-jury trial, or if the government demanded a jury trial, by pleading guilty. The statute thus put extreme pressure upon the defendant to waive his fifth amendment right not to plead guilty and his sixth amendment right to a jury trial. Extending the concept that due process prohibits conviction based upon a coerced guilty plea, the United States Supreme Court held that death penalty statutes may not be so drawn as to chill the exercise of basic constitutional rights.[41] By comparison, Stock argues that he was pressured to plead guilty to a specific intent crime in order to avoid going to trial on a charge not involving wilfulness. No jury waiver question is involved. Nor does this case have the aspect of "grisly choice" identified with waivers to avoid potential imposition of a death penalty.[42] Stock simply argues that the existence of one offense with lesser punishment encourages him to plead guilty rather than go to trial on the offense with greater punishment. The only fact which distinguishes his case from one in which there is a lesser included offense is that the supposed lesser offense by way of punishment involves conduct traditionally

40. 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

41. *Id.* at 582–583, 88 S.Ct. at 1216–1217, 20 L.Ed.2d at 147–148.

42. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

thought to carry greater criminality—specific intent.

That the offense generally considered to be the more serious receives a lighter sentence was a similar contention confronted in Green v. State.[43] There it was maintained that the Alaska minimum sentence of 15 years imprisonment for second degree murder while the minimum for first degree murder was one year at hard labor constituted a violation of constitutional due process rights. We disposed of the argument as to the disparity in sentences by stating:

> There are a number of states in which the courts have held that punishment for crime must be proportioned to the offense. Such holdings have usually been based upon the enunciation of the restriction in the respective state constitutions that penalties shall be proportioned to the nature of the offense. The Alaska Constitution, though of recent origin, contains no such restriction, nor does one appear in the federal constitution. We conclude, therefore, that in this jurisdiction punishment for crime need not be strictly proportioned to the offense. Only those punishments which are cruel and unusual in the sense that they are inhuman and barbarous, or so disproportionate to the offense committed as to be completely arbitrary and shocking to the sense of justice may be stricken as violating the due process clauses of the state and federal constitutions. Such punishments would also be void under article I, section 12 of the Alaska Constitution which declares that cruel and unusual punishments shall not be inflicted.[44]

The penalty provisions here involved do not constitute cruel and unusual punishment nor are they so completely arbitrary and shocking to the sense of justice that they must be stricken.

Affirmed.

43. 390 P.2d 433 (Alaska 1964).

44. *Id.* at 435 [footnotes omitted].